[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12278
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-23285-FAM

TRUDY MIGHTY,
as personal representative of the Estate of
David N. Alexis, deceased,

Plaintiff - Appellee,

versus

MIAMI-DADE COUNTY,
a Political subdivision of the State of Florida, et al.,

Defendants,

MIGUEL CARBALLOSA,
in his Individual and Official Capacity as
Miami-Dade County Police Officer,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 26, 2018)

Before WILLIAM PRYOR, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Officer Miguel Carballosa ("Defendant"), an officer in the Robbery

Intervention Detail at the Miami-Dade Police Department, shot and killed twenty-

six year old David Alexis outside of Alexis's home.  As the personal representative

of Alexis's estate, Plaintiff brought this lawsuit against Defendant[1] in his

individual and official capacities, asserting two claims:  a § 1983 claim alleging

that Defendant violated the Fourth, Eighth, and Fourteenth Amendments of the

United States Constitution and a Florida law wrongful death claim.

Defendant filed a motion to dismiss.  The district court denied the motion,

and we affirmed that decision.  *See generally Mighty v. Miami-Dade Cty.*, 659 F.

App'x 969 (11th Cir. 2016).  The parties pursued discovery, after which Defendant

moved for summary judgment, arguing that he is entitled to qualified immunity on

the § 1983 claim and to a complete defense under Florida Statute § 776.05(1) on

the wrongful death claim.

---

[1]  Plaintiff also sued Miami-Dade County, but those claims are not at issue in this appeal.

2

The district court denied Defendant's motion for summary judgment. Defendant has brought this interlocutory appeal, arguing again that he is entitled to qualified immunity on the federal claim and a complete defense on the state claim. We affirm the district court's decision denying Defendant's motion for summary judgment.

## I. BACKGROUND

On October 2, 2012, Miami-Dade Police Department officers saw a vehicle suspiciously circling a supermarket. Fifteen minutes later, other officers stopped the vehicle. The driver fled from the stop. Officers used the vehicle's tag information to try to locate the driver. This search revealed that the car was a rental car that had been rented to Nathalie Jean-Baptiste. Defendant then established a surveillance point near Jean-Baptiste's home, parking his white pick-up truck a few houses down from the residence. The truck was unmarked, meaning that there was nothing on the truck to identify it as a police vehicle.

At around 11:15pm, while Defendant was conducting surveillance, a car began pulling into a residence across the street from where Defendant was parked. The car did not match the description of the car from the traffic stop and the car was not pulling into Jean-Baptiste's home. The driver of the car was David Alexis and he was pulling into the home he shared with his parents. A few minutes earlier, after Alexis had finished work at North Shore Hospital, his friend and

3

former girlfriend Yalysher Acevedo met him at the hospital. Alexis drove his car and Acevedo followed in her car to Alexis's house. Alexis was going home to change his clothes, and then Alexis and Acevedo were planning to go to the beach to talk and have dinner.

According to Defendant, after Alexis pulled into his house, Alexis walked across the street towards Defendant's vehicle. Defendant stated that while Alexis was walking towards Defendant, Alexis's right hand was concealed behind his back and thus Defendant could not see that hand. Alexis looked through Defendant's front windshield. According to Defendant, Defendant then rolled down his window, identified himself as a police officer, and said "Let me see your hands." Defendant stated that Alexis said nothing, did not comply with Defendant's commands, and instead backed away with his right hand still concealed behind his back. According to Defendant, as Alexis was backing away, Defendant exited his vehicle, and Alexis brought his right hand around, revealing that he was holding a gun. Defendant stated that Alexis was holding his gun "outward, low, ready and it appeared like it was coming upwards." Defendant stated that when he saw Alexis's gun, he immediately discharged his weapon, firing multiple times and killing Alexis. Defendant fired the first shot at the front of Alexis's body. However, the remaining shots were to Alexis's side and back,

4

which, according to Plaintiff, suggests that Alexis turned away from Defendant while Defendant was shooting him.

As Defendant was firing his weapon, Acevedo pulled up. Acevedo saw Defendant standing in the middle of the street shooting at Alexis. According to Acevedo, Alexis was screaming and turning to run inside his house. Acevedo did not see a gun in Alexis's hand or on the street. Acevedo was scared so she did a U-turn and called 911. Acevedo later returned to the scene and spoke with police officers. Acevedo told the officers that she had previously seen Alexis carry a gun on his person and in his car. Officers discovered that Alexis had a concealed carry permit and found a gun registered to Alexis on the street.

As noted, Defendant testified that Alexis failed to comply with Defendant's commands and further that Alexis's right hand moved forward and up. Plaintiff's expert on the proper use of police force, Joseph Stine, disagreed, testifying that under Defendant's version of events, Plaintiff had complied with Defendant's commands. That is, Defendant had told Alexis, "Show me your hands," and never told him to drop his gun. Alexis complied with that directive, according to the expert.

As to whether evidence existed to dispute Defendant's claim that Plaintiff was armed at the time he was shot, Plaintiff's expert witness on firearms and ammunition, Gerald Styers, testified that in his opinion there was evidence to

5

support an inference that Alexis was not holding a gun at the time he was shot.

First, Alexis's gun had been found 20 feet away from Alexis's body. Styers also

noted that Alexis's gun had been found among the spent shell casings that had

fallen when Defendant fired his gun and that Defendant's gun ejects its cartridge

cases to the right and to the rear of the gun. Styers also discounted as an

explanation for Alexis's gun being near where Defendant fired his own gun the

possibility that Alexis had thrown the gun[2] because Styers found no markings or

gouges on the gun, which he would have expected to find because the gun would

have landed on asphalt. All of this led Styers to conclude that Alexis "was not in

possession of the firearm when he was fired . . . upon."

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this interlocutory appeal under 28 U.S.C.

§ 1291. The denial of qualified immunity "is an appealable 'final decision' within

the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

*Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). *See also Cottrell v. Caldwell*, 85

F.3d 1480, 1487 n.4 (11th Cir. 1996) ("Not only is a defendant entitled to

---

[2]  Notably, Defendant never said that Alexis threw the gun or offered any explanation how Alexis's gun happened to find itself near where Defendant would have been standing when Defendant shot Alexis. Further, in the report and recommendation, adopted by the district court when it denied summary judgment, the magistrate judge noted that Defendant's various accounts were "inconsistent and contradictory" concerning "when, where, and how" Defendant had perceived the possession of a gun by Alexis, as well as other material facts concerning Defendant's encounter with Alexis.

interlocutorily appeal the denial of his qualified immunity defense when he asserts it in a Rule 12(b)(6) motion, or in a Rule 56 motion . . ., he is entitled to interlocutorily appeal denial of both [ ] motions even where it results in two pretrial appeal[s].").

We review the district court's denial of summary judgment *de novo* and use the same legal standards as the district court. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). We view all facts and resolve all doubts in favor of the nonmoving party, *id.*, and "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute entails more than a metaphysical doubt as to the material facts. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009). Further, we may not make credibility determinations or weigh pieces of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154, 1160–62 (11th Cir. 2012). Those determinations are for a jury, not a judge, to make. *Anderson*, 477 U.S. at 255; *Strickland*, 692 F.3d at 1154, 1160–62.

## III. QUALIFIED IMMUNITY

Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

7

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U.S. at 525–26.  It balances the need to hold the government accountable with the need to protect officers from the distractions of litigation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Plaintiff does not dispute that Defendant was performing a discretionary function when he encountered Alexis.  Thus, the burden is on Plaintiff to prove that Defendant is not entitled to qualified immunity. *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003) ("Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate").

To satisfy this burden, Plaintiff must prove that (1) Defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232, 242.  "The salient question" is whether the law gave Defendant "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).  There are three ways for Plaintiff to prove that a right is clearly established:  "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional

8

right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

Plaintiff's claim that Defendant used excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, [ ] its proper application requires careful attention to the facts and circumstances of each particular case." *Id.* at 396 (citations and quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and one must consider "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. To determine if the use of deadly force was reasonable, we look to the severity of the crime at issue, whether the suspect tried to flee or resist arrest, whether, if feasible, the officer issued a warning before using deadly force, and whether the suspect posed an immediate threat to the officer or others. *Penley v. Eslinger*, 605 F.3d 843, 850–51 (11th Cir. 2010). *See also Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (holding that it is "constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril"). It is not

constitutionally reasonable for an officer to use deadly force if the suspect is unarmed and non-dangerous. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987) ("We hold that shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was—even in July, 1983—an unreasonable seizure and clearly violated fourth amendment law.").

Taking the facts in the light most favorable to Plaintiff, as we must do, we agree with the district court that Defendant is not entitled to qualified immunity on Plaintiff's Fourth Amendment § 1983 claim. Looking to the four factors that justify the use of deadly force, the first factor is the severity of the crime that the perpetrator is believed to have committed. Here, Alexis was not suspected of committing any crime. Second, Alexis did not try to flee or resist arrest. Although Alexis did slowly back away from Defendant's car towards his own home, he did not run or resist Defendant's commands. Third, Defendant did not issue a warning before using this deadly force. The factor at issue here is whether Alexis posed an immediate threat to Defendant. Viewing the facts in the light most favorable to Plaintiff, we must assume that Alexis was not holding a gun—and that Defendant did not reasonably perceive him to be armed—meaning there is a disputed issue of fact as to whether Plaintiff posed a threat to Defendant when Defendant shot him.

If Defendant did not reasonably perceive that Alexis threatened him, his use of deadly force constituted a violation of Alexis's Fourth Amendment rights.

Further, case law from the Supreme Court and this circuit clearly establishes that it is not reasonable for a police officer to use deadly force against an unarmed and non-dangerous man, which, under Plaintiff's version of the facts, Alexis was. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011) ("[U]nprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment."); *McKinney v. DeKalb Cty., Ga.*, 997 F.2d 1440, 1443 (11th Cir. 1993) (denying qualified immunity to an officer who shot an individual who was merely shifting positions, had already put down the knife that he was previously holding, and was not threatening the safety of others). We therefore affirm the district court's denial of qualified immunity.

## IV.  <u>STATE LAW CLAIMS</u>

Defendant argues that he is protected from Plaintiff's state law wrongful death claim by Florida Statute § 776.05(1).  Plaintiff urges this Court to decline to exercise pendant appellate jurisdiction over this claim.  As explained above, we have jurisdiction to hear Defendant's appeal of the district court's ruling on the § 1983 claim because the denial of qualified immunity is considered a "final

11

decision[ ]" within the meaning of 28 U.S.C. § 1291. *Mitchell*, 472 U.S. at 530. We also have discretion to exercise pendant appellate jurisdiction over its ruling on the state law claim. *Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994). During the interlocutory appeal of the motion to dismiss, we declined to exercise pendant appellate jurisdiction over this state law claim. *Mighty*, 659 F. App'x at 973–74. Similarly, and for the reasons set out in that opinion, we again decline to exercise pendant appellate jurisdiction over this state law claim. *Id.*

## CONCLUSION

In sum, we **AFFIRM** the denial of qualified immunity and dismiss the appeal with respect to the state law claim.